## MURDOCK v. CLARKE et al.[*]

### No. 13,475; June 7, 1890.

24 Pac. 272.

**Mortgages.**—A **Conveyance of Land to Secure the Payment** of money, though the grantee is put in possession under an agreement for an accounting for the rents and profits, is only a mortgage, and does not pass the legal title.

*For subsequent opinion in bank, see 88 Cal. 384, 26 Pac. 601.

**Mortgage — Mortgagee in Possession — Accounting. —** By an agreement between a mortgagor and mortgagees, the latter were to have the sole right to the possession of the land mortgaged, accounting for the rents and profits, and were to select a person to manage the property. At an accounting against the mortgagees, the latter testified that they were to send a man to take possession, in order to take care of the personal property security, and that everything was to be run in their name. They also spoke of the man selected, both in their testimony and in the pleadings, as their agent. Held, that for the purposes of possession and accounting, such person must be considered as the agent of the mortgagees only, although his selection was approved by the mortgagor, and his salary was paid as a part of the running expenses. In such case the mortgagees are held to the exercise of reasonable diligence in the management of the property mortgaged.

**Mortgage—Mortgagee in Possession—Accounting.—**Where both the agent and the defendants kept their own cattle on the mortgaged land, along with the cattle of the mortgagor, the wrong done was satisfied by charging defendants with a proportion of the running expenses, and with the value of the use of the land.

**Mortgage — Mortgagee in Possession — Accounting.—**Nothing was chargeable to defendants on account of horses which they sent to the land, and which were needed and used for farm work.

**Mortgage—Mortgagee in Possession—Accounting.—**One of the notes given by the mortgagor providing for compound interest if not paid when due, the net receipts were properly applied first to the payment of the interest on such note.

**Mortgage — Mortgagee in Possession—Accounting.—**Sums advanced to the wife of the mortgagor without any order from him were not chargeable against his estate.

**Pleading—Items of Account.—**It not being necessary, under Code of Civil Procedure, section 454, to give an itemized account in pleading, the findings need not give the items of the account.

**Sale—Estoppel from Accepting Bill of Sale.—**One who accepts a bill of sale purporting to transfer a certain number of cattle is not estopped thereby from denying that he actually received that number.

**Appeal—Presumptions.—**As Against Respondents on appeal, the findings of the lower court must be presumed to be true. It will not be presumed that an error was the result of inadvertence.

APPEAL from Superior Court, Lassen County; Phil W. Keyser, Judge.

J. D. Goodwin, D. W. Jenks and W. N. Goodwin for appellant; A. L. Hart and S. Solon Hall for respondents.

HAYNE, C.—This is the second time that this case has been before the court on its merits. The action was by the administratrix of a mortgagor against the mortgagees in possession under an agreement for an accounting of the rents and profits, and to redeem the property. The trial court adjudged that there was due to the defendants the sum of $31,926.37; that upon payment thereof the defendants should reconvey the real property and redeliver the personal property; and that, if the plaintiff should fail to make such payment within thirty days, the property should "vest absolutely in the defendants." The plaintiff appeals from the judgment, and from an order denying a new trial.

The following facts are undisputed: On February 4, 1875, Adam Murdock, the plaintiff's intestate, borrowed from the defendant Clarke the sum of $8,500, and gave his note therefor, to become due one year after date, with interest at the rate of one and one-quarter per cent per month, payable semi-annually, and, if not so paid, to be compounded. To secure the payment of this note, Murdock made a deed to Clarke of a tract of three hundred and thirty acres known as the "Beaver Creek Ranch," and assigned to him a certificate of purchase of a tract of four thousand three hundred and sixty acres, situated about twenty miles from the first, and known as the "Big Valley Ranch." Soon after this, Clarke assigned to the defendant Cox a half interest in this note and security. Shortly afterward, viz., on March 22d of the same year, Murdock borrowed from Clarke and Cox a further sum of $5,000, and gave his note therefor, bearing interest at one and one-half per cent per month. In order to secure the payment of this latter note, and to further secure the payment of the first note, and of such additional sums as should be advanced, it was agreed that Clarke and Cox should take possession of the two ranches, and of the cattle and other personal property thereon, and out of the rents and profits should pay the running expenses, and apply the balance to the liquidation of the amount due to themselves. The property was to be managed by a person to be selected by the defendants, but whose salary was to be paid as part of the running expenses. Murdock had permission to reside upon the property, and assist in the work, but was not to exercise any control. It was also agreed that,

as further security, Murdock should assign to Clarke and Cox a half interest in a portable sawmill, then on public land, together with the machinery, etc., then owned by him in partnership with one Quinn, who was the manager thereof. In pursuance of this agreement, the defendants, with the approval of Murdock, selected one Stanton to manage the property, and he went there on March 22d; but the formal bill of sale was not made out until April 10th. On the next day after the execution of this bill of sale, the defendants advanced, at the request of Murdock, the sum of $3,176.45, for which he gave his note bearing interest at one and one-half per cent per month; and subsequently further advances were made. Murdock remained upon the property until the following December, at which time he died. About eight months thereafter the plaintiff was appointed administratrix of his estate. The property continued to be managed by Stanton until May, 1886, at which time he died, and one Snell was appointed by the defendants as his successor. During the period of Stanton's management, he received various sums of money from sales of cattle, etc., out of which sums he paid the running expenses, and gave the remainder to the defendants. During a considerable portion of the time the defendants had cattle of their own upon the ranches, and Stanton kept his own cattle there also. They were not kept separate from the Murdock cattle, but all were taken care of together. The accounting sought embraces the whole period, and various charges of neglect and misfeasance are made.

A fundamental question in the case is as to the capacity in which Stanton acted. The defendants contend that he was the agent of both sides, and consequently that neither is responsible to the other for his acts, while the appellant contends that he was the agent of the defendants only. We think that the latter position is correct. Until recently the defendants seem to have understood that Stanton was their agent. At the first trial of the case Clarke testified as follows: "We were to send a man to take possession of the property, take a bill of sale of the stock, and everything was to be run in our name." And at the last trial the same defendant testified as follows: "I told Adam Murdock we would have to have a man go there and take possession.

or the personal property security would be no good." The other defendant testified at the first trial as follows: "I had the real estate possession of everything. I was put in possession of everything. Question. Everything he had; for what purpose? Answer. For the purpose that he told me—that during the year he would pay off the debt, and if not we were to hold the property, and manage it until we got our money." This testimony accords with the circumstances of the case. It is admitted that the agreement gave to the defendants the sole right of possession of the ranches, and we do not understand them to maintain that they did not exercise all their rights under the agreement, so far as the ranches are concerned. But it is not pretended that they had possession in any other way than through Stanton; and we think it follows that, for the purposes of possession, and all its consequent responsibility, Stanton must be held to have been their agent; and at the first trial the defendant Clarke testified distinctly that such was the case. He was asked this question: "This man Stanton was the agent of you and Murdock in taking charge of the property?" And he answered: "No, sir; he was my agent." Furthermore, Stanton seems to have always taken his orders from the defendants; and we do not think that all this is outweighed by the fact that his wages were to be paid as part of the running expenses, or by the fact that his selection was approved by Murdock, or by both circumstances together. But the matter is put beyond doubt by the defendants' answer, which avers "that according to such agreement the defendants, on or about the first day of April, 1875, through their agent, Stanton, took possession of the said two ranches, and have ever since run and operated the same, and are now in possession thereof." Even without this averment, we think that, upon the evidence, Stanton must be held to have been the agent of the defendants only. As we construe the findings, however, the court below did not take this view of Stanton's capacity, but held that he was the agent of both sides; and this is the construction of the counsel for the respondents, for they say: "There is nothing in the record, either in the evidence or in the findings, which would justify the inference that, by their contract, Clarke and Cox assumed to become

responsible for the management of the Murdock estate.''
And they devote several pages to an argument to show
that Stanton was the agent of both sides, and consequently
that neither was responsible to the other for his acts. It
thus appears that the court took the account upon a funda-
mentally wrong principle. This must have had an impor-
tant influence upon the result, and there are several in-
jurious consequences which we can see that it did have.
In the first place, the court charged the defendants with
the value of the use of the property ''for their own stock''
only, whereas, if Stanton was their agent, they were re-
sponsible for his acts, and should have been charged with
the value of the use of the ranches for the stock that he
kept there. In the next place, they should have been
charged with a proportion of the expense of the care, etc.,
of Stanton's cattle. Upon the former appeal, it was held
that they must be charged with a proportion of the expense
of the care, etc., of their own cattle (59 Cal. 695, 696);
and they were so charged by the court below. But for this
purpose their agent's cattle must be considered as theirs.
Except in the single item of hay, however, they were
charged only with a proportion of the expense of their own
cattle, and not for those of Stanton. This is apparent from
the transcript, where the defendants' cattle are identified
as having been bought from one Ames, and they are charged
with one-third of the expenses, because such was the propor-
tion of the Ames cattle to the Murdock cattle; and it is ex-
pressly stated that it was ''upon the principle of this find-
ing'' that the proportion of the expenses was determined.
These are consequences which can be seen to have resulted
from the erroneous principle upon which the court pro-
ceeded. But the principle is so fundamental in the account-
ing that, even if no injurious consequence affirmatively ap-
peared, we think the case would be within the rule that,
where error is clearly shown, injury is presumed, unless
the contrary appears: See cases collected in Hayne on New
Trial and Appeal, sec. 287.

There is another error in the findings, not flowing entirely
from the erroneous principle upon which the court pro-
ceeded, but somewhat broader. It is perfectly plain that
the defendants should have been charged with a propor-

tion of the taxes upon the cattle, as well as of the other expenses. But the court expressly excludes the taxes from the amount to be deducted from the running expenses. The respondents' counsel say in reference to this that "the words 'and taxes' were evidently inadvertently put into said finding." But, although the error is plain, we do not see upon what basis it could be set down to inadvertence. As against the respondents, the findings must be presumed to be true; and that an error is the result of inadvertence will not be presumed, but must be made to appear: Carpenter v. Superior Court, 75 Cal. 598, 19 Pac. 174; Wunderlin v. Cadogan, 75 Cal. 619, 17 Pac. 713.

We have considered whether the judgment could not be modified so as to avoid the consequences of the errors above referred to. But the findings afford no basis for such a modification, even as to the injurious results which affirmatively appear. For example, it is not found what was the number of Stanton's cattle, nor how long he kept them on the property. In the judgment of the writer of this opinion, it would conduce to the better administration of justice if the appellate court could look into the evidence for the purpose of modifying a judgment to avoid the consequences of any error that may have crept into the proceedings. But, while it may look into the evidence to see if it sustains the findings, or to ascertain and declare the principles of law which apply to the case, it is settled that it cannot resort thereto for the purpose of making findings to serve as a basis for a modification of the judgment: Ellis v. Jeans, 26 Cal. 278; Carpentier v. Gardiner, 29 Cal. 164; Hayes v. Martin, 45 Cal. 563. And in addition to this, as above remarked, we cannot see that the erroneous principle upon which the court proceeded did not have injurious consequences which do not appear.

There is also a radical error in the decree. The court adjudged, in effect, that the legal title passed to the defendants, and it gave to the plaintiff a certain time in which to redeem, failing which the property was to vest absolutely in the defendants. But, as it is admitted that the conveyances were intended only to secure the payment of money, they were mere mortgages, and did not pass the legal title. "It is the settled rule in this state that, if a

deed absolute in form was made merely to secure an indebtedness [to the grantee], it is a mere mortgage, and does not pass the title'': Smith v. Smith, 80 Cal. 325, 21 Pac. 4, 22 Pac. 186, 549. See, also, Hall v. Arnott, 80 Cal. 352, 22 Pac. 200; Booth v. Hoskins, 75 Cal. 275, 17 Pac. 225; Raynor v. Drew, 72 Cal. 309, 13 Pac. 866; Healy v. O'Brien, 66 Cal. 519, 6 Pac. 386; Taylor v. McLain, 64 Cal. 514, 2 Pac. 399. And the fact that the mortgagees were put in possession does not change the rule. As was said in Smith v. Smith, above cited, ''such a deed gives a mere lien upon the property, just as if the parties had put their agreement in the form of a mortgage''; and it has been decided that, in this state, the interest of the mortgagee is not enlarged or affected by the fact that he is in possession under the mortgage: Dutton v. Warschauer, 21 Cal. 609. The legal title, therefore, remained in Murdock, and vested in his heirs, and is not in the defendants; and the court below was not authorized to decree that it should vest absolutely in the defendants upon the failure of the plaintiff to pay what was due within a certain time. The defendants, however, have a right to retain possession until the sums due to them have been paid; and, even if they have not, the court has power to impose proper conditions upon the plaintiff: Raynor v. Drew, 72 Cal. 311, 13 Pac. 866; Booth v. Hoskins, 75 Cal. 271, 17 Pac. 225; De Cazara v. Orena, 80 Cal. 134, 22 Pac. 74. And the answer prays that the property be sold, and the proceeds applied to the payment of the debt. The decree, therefore, ought to have provided that, in case of the failure of the plaintiff to pay what was due within a specified time, the property should be sold, and the proceeds applied to the payment of whatever is due to the defendants.

As the case must go back to the court below, it is proper to dispose of certain other questions which will arise upon a retrial, and which have been argued.

1. It is contended for the appellant that the defendants were trustees, and were therefore bound to account as such, and are held to the same strict responsibility in the management of the property committed to their care. It is true that mortgagees in possession are often spoken of as ''trustees.'' But they are so only in a limited sense: Ten Eyck

v. Craig, 62 N. Y. 422; Clarke v. Sibley, 13 Met. (Mass.)
213; Cholmondeley v. Clinton, 2 Jac. & W. 184; 1 Hill,
Mortg. 391. As remarked by Shaw, C. J., in reasoning to
a somewhat different point: ''In some very limited respects,
a mortgagee is a trustee; as when he has entered, and
is in the receipt of the rents and profits, he is liable to
account therefor, and in that respect may be denominated
a 'trustee' '': King v. Insurance Co., 7 Cush. (Mass.) 7, 54
Am. Dec. 683. That they are bound to account for the rents
and profits is a matter of course: 2 Story, Eq. Jur., 13th
ed., sec. 1016a; Raun v. Reynolds, 15 Cal. 471. And we
think that the rule as to trustees in general, viz., that their
accounts should be clear, distinct, and accurate, and that all
obscurities and doubts should be resolved against them (2
Perry, Trusts, 4th ed., sec. 821), applies here. But the ac-
counting is not to be extended to imaginary profits. Where
no negligence or improper conduct is alleged, a mortgagee
in possession is chargeable with what he has actually re-
ceived, and no more: Benham v. Rowe, 2 Cal. 407, 56 Am.
Dec. 342. In this case, negligence and improper conduct
are charged, and various claims are based thereon. It is
therefore necessary to consider what was the degree of care
required of the defendants. Chancellor Kent, in his Com-
mentaries, stated the rule as follows: ''If the mortgagee
obtains possession of the mortgaged premises before fore-
closure, he will be accountable for the actual receipts of
the net rents and profits, and nothing more, unless they
were reduced or lost by his willful default or gross negli-
gence. By taking possession, he imposes upon himself the
duty of a provident owner; and he is bound to recover
what such an owner would, with reasonable diligence, have
received'': 4 Kent's Commentaries, 166. This statement
of the rule has found its way into the decisions of the courts,
and the treatises of text-writers (see Hidden v. Jordan,
28 Cal. 309; Moshier v. Norton, 100 Ill. 68), and a similar
passage was quoted from a modern text-writer on the former
appeal of this case (59 Cal. 694); but it cannot be deter-
mined from the opinion whether the court meant to estab-
lish a rule or not. But, if the term ''gross negligence''
is to be taken in its ordinary sense, viz., as denoting the

absence of slight care (see Shear. & R. Neg., 4th ed., sec. 49), it is manifest that the passage quoted is somewhat inconsistent; for, if the mortgagee, by taking possession, "imposes upon himself the duty of a provident owner, and is bound to recover what such an owner would with reasonable diligence have received," it is evident that he is bound to something more than slight care, and is responsible for something less than gross negligence. What we think the passage means, when taken as a whole, is that the mortgagee in possession is bound to exercise reasonable care, and is responsible for the want thereof. This was the construction given to similar language by a comparatively recent case in Alabama. The court said: "On a bill to redeem, a mortgagee in possession will not be held accountable for anything more than the rents actually received, unless there has been willful default or gross negligence, which in such case is the measure of reasonable diligence": Gresham v. Ware, 79 Ala. 199. That reasonable diligence is required, is laid down in several cases: Shaeffer v. Chambers, 6 N. J. Eq. 548, 47 Am. Dec. 211; Strong v. Blanchard, 4 Allen (Mass.), 543, 544; Scruggs v. Railroad Co., 108 U. S. 375, 27 L. Ed. 756, 2 Sup. Ct. Rep. 780. It seems plain, upon principle, that the mortgagee in possession is bound to something more than slight care. And we think that Chancellor Kent, and the courts and writers who adopted his language, meant to say that reasonable care was required. Applying this rule to the case before us, we think that the evidence shows, without material contradiction, that, while there were some errors of judgment, the general management of the property was what was required. Especially does this appear when it is considered that it was agreed that the ranches were to be run as they had been by the mortgagor. This does not mean that, if the mortgagor was negligent as to any matter, the mortgagees should be so, too, but that the management of the mortgagees should be on the same general lines as that of the mortgagor; and, as above stated, we think it was.

2. Much argument is based upon the undoubted fact that both Stanton and the defendants kept their own cattle upon the ranches, not separate from the Murdock cattle, but together with them. This was certainly wrong. But it

was settled on the former appeal that it made them liable
for a proportion of the running expenses (59 Cal. 695, 696);
and, in addition to this, the court below allowed the value
of the use of the land. This, we think, was all that could
properly be charged against the defendants on this ac-
count. In addition to the cattle, the defendants sent some
horses to the property. This was because the horses were
needed for ranch work, and they were used for that pur-
pose. This was for the benefit of the property, and nothing
can be charged against the defendants by reason thereof.
Similar remarks apply to the stallion. He was useful as
a work-horse, and for breeding the ranch mares. The
money made from outside parties during the breeding season
belonged to the defendants.

3. Part of the property mentioned in the bill of sale was
a half interest in a portable sawmill located upon public
land, and owned by Murdock in partnership with one Quinn.
No profits were ever made from this mill, and it does not
clearly appear what finally became of it. It was moved
once while Quinn was in control. Afterward, it was moved
again, and it seems that one Harris "took it." The court
below found that the defendants never had possession, and
the evidence leads us to the same conclusion. The defend-
ants incurred no liability to Murdock or his estate by not
taking possession; for it was as much his duty to deliver
it to them, as theirs to receive it, and there is nothing to
show that he tendered it. Even if the defendants be con-
sidered as having been in possession, we cannot say that
there was a want of reasonable care on their part. Quinn
was allowed, with the acquiescence of Murdock, to run it
as he had been doing previous to the bill of sale. After
Murdock's death, Quinn was the surviving partner, with
authority to settle up the affairs and dispose of the prop-
erty. He is the person who is accountable to the plaintiff
in relation to the matter. The defendants are not bound
to litigate with him for the benefit of the estate.

4. A point is made in relation to the number of cattle
received by the defendants with the ranches. The bill of
sale purports to transfer thirteen hundred and twenty-two
head, and it is argued that its acceptance estopped the de-
fendants from denying that they received that number.

There is no force in this suggestion. After the bill of sale was signed, it was Murdock's duty to deliver the cattle in accordance therewith. If he did not perform this duty to its full extent, the defendants are certainly at liberty to prove the fact.

5. As above stated, one of the notes provided for compounding the interest if not paid when due. The court below refused to allow compound interest, and the respondents contend that this was error. The theory upon which the court acted was, probably, that the receipts should have been applied first to keeping down the interest upon the note which provided for compound interest; and this, we think, was the right view. The net receipts should be applied first to the payment of the interest upon the note which provided for compound interest, and afterward to the payment of the interest upon the other sums due; and, if anything remained, it should be applied to the payment of the principal. There can be no doubt that the note bore interest from its date.

6. Some objection is made to the findings; and, for the guidance of the court below, it may be stated that it is not necessary for the findings to give the items of the account. It is not necessary to give an itemized account in pleadings (Code Civ. Proc., sec. 454), and a finding which follows the pleading is sufficient. In this, as in other cases, it is sufficient to find the ultimate facts, or secondary facts from which the ultimate fact necessarily follows.

7. Whatever sums were advanced to Mrs. Anna Murdock upon the order of the mortgagor are chargeable against the estate, but sums advanced to her without any such order are not so chargeable. Sums advanced to the widow personally cannot be charged against the estate. We therefore advise that the judgment and order appealed from be reversed and the cause remanded for a new trial.

We concur: Vanclief, C.; Foote, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order appealed from are reversed and the cause remanded for a new trial.